UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA : | **CRIMINAL COMPLAINT** |
| v. : | Mag. No. 17-4186 |
| ANDREW TABLACK : | |
| and : | **FILED UNDER SEAL** |
| STEPHAN DURHAM : | |

I, Joseph M. Espinoza, being duly sworn, state the following is true and correct to the best of my knowledge and belief.

SEE ATTACHMENT A

I further state that I am a Task Force Officer with the United States Drug Enforcement Administration, and that this Complaint is based on the following facts:

SEE ATTACHMENT B

continued on the attached page and made a part hereof.

TFO _____
Task Force Officer Joseph M. Espinoza
Drug Enforcement Administration

Sworn to before me and subscribed in my presence,
on December 19, 2017, in Essex County, New Jersey

_____
HONORABLE MICHAEL A. HAMMER
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### COUNT ONE
**(Conspiracy to Distribute a Controlled Substance Analogue)**

From in or around March 2017 through on or about December 19, 2017, in Monmouth County, in the District of New Jersey and elsewhere, the defendants,

**ANDREW TABLACK**
and
**STEPHAN DURHAM**

did knowingly and intentionally conspire and agree with others to distribute and to possess with intent to distribute 400 grams or more of a mixture and substance containing a detectable amount of a Schedule II controlled substance analogue, as defined in Title 21, United States Code, Section 802(32)(A), namely N-(1-phenethylpiperidin-4-yl)-N-phenylcyclopropanecarboxamide ("cyclopropyl fentanyl"), knowing that the substance was intended for human consumption, contrary to Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 813.

In violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2.

## COUNT TWO
### (Distribution of a Controlled Substance Analogue)

From in or around March 2017 through on or about December 19 2017, in Monmouth County, in the District of New Jersey and elsewhere, the defendant,

### ANDREW TABLACK

did knowingly and intentionally distribute and possess with intent to distribute 400 grams or more of a mixture and substance containing a detectable amount of a Schedule II controlled substance analogue, as defined in Title 21, United States Code, Section 802(32)(A), namely N-(1-phenethylpiperidin-4-yl)-N-phenylcyclopropanecarboxamide ("cyclopropyl fentanyl"), knowing that the substance was intended for human consumption.

In violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 813, and Title 18, United States Code, Section 2.

## ATTACHMENT B

I, Joseph M. Espinoza, am a Task Force Officer with the United States Drug Enforcement Administration ("DEA"). I have been personally involved in the investigation of this matter. The information contained in this Criminal Complaint is based on my personal knowledge and on information obtained from other sources, including but not limited to: (a) statements made or reported by various witnesses with knowledge of relevant facts; (b) my review of publicly available information relating to the defendants; and (c) my review of audio recordings and other recorded communications. Because this affidavit is being submitted for the sole purpose of establishing probable cause to support the issuance of a Complaint, I have not included each and every fact known to the Government concerning this matter. Where statements of others are set forth herein, these statements are related in substance and in part. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

## Background

### *Dealings with CS1*

1. In or around August 2017, the DEA began investigating defendants Andrew Tablack ("TABLACK"), Stephan Durham ("DURHAM"), and other individuals known and unknown (collectively, the "Subjects") regarding possible violations of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), 813 and 846.

2. Specifically, on or about August 31, 2017, a confidential source ("CS1")[1] advised law enforcement that CS1 had purchased large quantities of fentanyl[2] from a person known by CS1 only as "Blue Man" or "Blue," who was distributing controlled substances using a darknet website. During the course of the investigation, law enforcement has been able to identify "Blue Man" or "Blue" as TABLACK.

3. Darknet sites operate on the Dark Web, which cannot be accessed without special software, and the Dark Web is a smaller part of the Deep Web.

---

[1] CS1 has a pending federal criminal case as a result of the instant investigation, and is cooperating with law enforcement in the hopes of obtaining consideration for his federal charge.

[2] Preliminary laboratory testing has revealed that the substance purchased by CS1 from TABLACK is cyclopropyl fentanyl, an analogue of fentanyl, a Schedule II controlled substance. Where Attachment B uses the term "fentanyl," the substance referred to is actually cyclopropyl fentanyl.

3

The Deep Web is an area of the internet not accessible using popular search engines such as Google and accounts for approximately 96% of the internet. The Surface Web or Normal Web, on the other hand, accounts for just 4% of the internet. The vast majority of internet users are only familiar with the existence of the Surface Web.

4. On or about August 30, 2017, law enforcement executed a search warrant at a premises utilized by CS1 as a stash house and distribution center (the "stash house"). Among other items and equipment, law enforcement seized approximately 300,000 pills from the stash house, some of which later tested positive for cyclopropyl fentanyl. Specifically, a DEA laboratory determined that approximately 123,084 pills seized from the stash house contained over 9 kilograms of cyclopropyl fentanyl. CS1 subsequently informed law enforcement that all of the fentanyl pills at the stash house had been supplied by TABLACK. CS1 stated that he had purchased hundreds of thousands of fentanyl pills from TABLACK.

5. According to CS1, CS1 first purchased fentanyl from TABLACK on the darknet marketplace AlphaBay. After their initial contacts through AlphaBay, CS1 and TABLACK began exchanging encrypted text messages on a self-destruct timer. Thereafter, CS1 and TABLACK exchanged text messages to arrange sales and shipments of fentanyl through the United States mails. CS1 provided TABLACK with delivery addresses in New Jersey for the shipments and made payments to TABLACK on the internet using a Bitcoin wallet.

6. On or about September 7, 2017, at the direction of law enforcement, CS1 communicated with TABLACK to arrange for the shipment of approximately 500,000 fentanyl pills.

7. Before CS1 could provide TABLACK with receiving addresses for the shipment, on or about September 8, 2017, TABLACK texted CS1 tracking information for a parcel shipped from California and destined for Worcester, Massachusetts (the "Worcester parcel"). CS1 inquired about the Worcester tracking number, and TABLACK explained over text messages that he had sent CS1 that tracking number, which was for a shipment of approximately 30,000 fentanyl pills, by mistake; TABLACK had shipped the Worcester parcel to another customer. The Worcester parcel was seized by law enforcement on or about September 11, 2017, and found to contain one large vacuum-sealed plastic bag weighing approximately 3.221 kilograms. A DEA laboratory determined that there were approximately 29,141 pills in the bag containing more than 3 kilograms of cyclopropyl fentanyl.

4

8. On or about September 9, 2017, CS1 provided six potential delivery addresses in New Jersey to TABLACK. On or about September 11, 2017, TABLACK texted CS1 a link to an encrypted webpage displaying three postal tracking numbers for three separate parcels (the "New Jersey parcels"), which confirmed that TABLACK had shipped the New Jersey parcels to three of the six delivery addresses provided to TABLACK by CS1. TABLACK relayed to CS1 that he had shipped 200,000 fentanyl pills to delivery addresses provided by CS1 in the New Jersey parcels; TABLACK told CS1 that two of the parcels contained 75,000 fentanyl pills and the third contained 50,000 fentanyl pills.

9. The New Jersey parcels were intercepted by law enforcement on or about September 13, 2017, and found to contain plastic bags filled with approximately 200,000 small blue pills of suspected fentanyl, which tested positive for cyclopropyl fentanyl. Specifically, a DEA laboratory determined that there were approximately 226,520 pills in the bags containing nearly 20 kilograms of cyclopropyl fentanyl.

10. On or about September 16, 2017, TABLACK informed CS1 via text that he had purchased a ZP-9 pill press machine, which (according to TABLACK) was worth between $6,000.00 and $7,000.00, from a company named Shanghai Machinery.

11. On or about September 20, 2017, TABLACK texted CS1 a Bitcoin address so that CS1 could transfer money to TABLACK to pay for past purchases of fentanyl. Subsequent blockchain analysis of that address led to another Bitcoin address registered to a user with a certain email account ("Email-1"), which is in turn registered to TABLACK.

12. On or about October 4, 2017, TABLACK admitted in a text exchange with CS1 that he did not have any legal employment and was focusing exclusively on his drug manufacturing and distribution operation.

13. On or about October 8, 2017, TABLACK informed CS1 via text that he would be visiting New York City. In response, CS1 suggested that CS1 personally drop off a payment for TABLACK in New York. On or about October 9, 2017, TABLACK texted CS1 that his flight would arrive at approximately 10:00 p.m. on Wednesday, October 11, 2017. On or about October 12, 2017, TABLACK texted to confirm his arrival. TABLACK and CS1 subsequently made plans to meet in person at the hotel where TABLACK was staying (the "Hotel").

14. In response to a subpoena issued in this investigation, the Hotel provided TABLACK's registration records, which included the cellular phone number and credit card number TABLACK used to make his reservation. The

records confirmed that TABLACK checked into the Hotel on or about October 11, 2017, and was set to check out on October 14, 2017.

15. On or about October 12, 2017, the DEA surveilled TABLACK at various locations in New York City, including in and around the World Trade Center neighborhood and in or around the Hotel. At approximately 8:00 p.m., TABLACK and CS1 met in person at the Hotel. The conversation was consensually recorded, and law enforcement maintained surveillance outside the Hotel and in the lobby bar. According to CS1, TABLACK spoke about his past transactions with CS1, including the Worcester parcel and the New Jersey parcels, and future business dealings with CS1, including TABLACK's proposal that CS1 serve as TABLACK's distributor for large quantities of marijuana to be shipped by TABLACK from California to New Jersey. TABLACK also discussed his drug manufacturing and distribution operation, informing CS1 that he and a worker he employs operate multiple high-capacity pill press machines and ship fentanyl pills all over the country. TABLACK also mentioned that he had recently purchased two new pill press machines.

16. In response to a subpoena issued in this investigation, law enforcement learned that TABLACK made two purchases from a pill press vendor ("Vendor-1") in Ohio in or around the month of September 2017: one for $1,068.89 on or about September 5, 2017, and one for $1,386.80 on or about September 25, 2017. Based on TABLACK's statement to CS1 that he had recently purchased two pill press machines, the name of the Vendor-1, and the purchase prices, which are consistent with the prices of high-capacity pill press machines, law enforcement believes that these purchases were likely for the two additional pill press machines TABLACK mentioned to CS1.

17. On or about October 13, 2017, TABLACK texted CS1 a Bitcoin wallet address so that CS1 could transfer money to him to pay for past purchases of fentanyl.

**Other Drug-Related Activity**

18. On or about May 22, 2017, the DEA received information from China's Ministry of Public Security, Narcotics Control Bureau identifying individuals in the United States who had ordered fentanyl from a laboratory based in Wuhan, China. The operators of the laboratory had been labeling fentanyl as food additives and then shipping fentanyl overseas using various international shipping agencies. The investigation identified TABLACK as one of the laboratory's clients who had ordered a shipment of fentanyl.

19. Law enforcement determined through its investigation that TABLACK utilizes a UPS Store mailbox in Beverly Hills, California (the "UPS mailbox") to receive mail under his own name and under the entity name "Russuk LLC." On or about June 9, 2017, U.S. Customs and Border Protection seized a parcel purportedly containing beauty products that had been shipped by "Billy Cheuk, Flat F 8/f Tower 2, Century Gateway, Hong Kong" to the UPS mailbox (the "Cheuk parcel"). The contents of the Cheuk parcel, a white powder, tested positive for 527 grams of cyclopropyl fentanyl. TABLACK has received 25 parcels from China and Hong Kong at the UPS mailbox since in or around August 2016, including as recently as December 6, 2017.

20. On or about December 13, 2017, law enforcement intercepted and opened a parcel from "Shanghai Tianhe Machinery" in Shanghai, China and addressed to "Russuk LLC" at the UPS mailbox. TABLACK had told CS1 on or about September 16, 2017, that he was using a ZP-9 pill press purchased from a company called Shanghai Machinery. The parcel from "Shanghai Tianhe Machinery" contained two metal stamping dies, one engraved with the word "Xanax" and the other with the number "2." Such dies are used to stamp pills during the pill manufacturing process.

21. In response to a subpoena issued in this investigation, law enforcement learned that TABLACK had listed a shipping address for his account with eBay, an online marketplace, as Russuk LLC, at a location in Van Nuys, California, 91405-1090 (the "Raymer address"). Between on or about February 9, 2017 and on or about August 30, 2017, TABLACK purchased nine pill press machines, which cost between $1,300.00 and $1,650.00 each, on eBay. He ordered six of the nine pill press machines on or about August 30, 2017. During the same period of time, TABLACK purchased laboratory-grade sodium saccharin powder, a substance that may be used in pressing fentanyl pills, and a compensator used to stabilize the recoil and movement of a firearm from eBay.

22. Law enforcement ran the address for the Raymer address against utilities records maintained by the Los Angeles Department of Water and Power and learned that since on or about July 26, 2013 through the present, utilities at the Raymer address have been registered to DURHAM, doing business as "Other Chemical & Allied Products Merchant Wholesalers."

23. Mailing records revealed that a number of shipments suspected of containing pill press machines were sent to the Raymer address. On or about June 10, 2017, a parcel from "Shanghai Tianhe Machinery" arrived at the Raymer address addressed to "Russuk LLC." Since March 3, 2017, 27 parcels

have arrived at the Raymer address from China. 12 of the parcels were addressed to "Matthew Durham," and 7 parcels, addressed to "Russuk LLC," weighed more than 100 pounds. DURHAM'S credit report identifies him as "Stephen M. Durham," "Matthew Durham," and "Matt Durham."

24. DURHAM received a parcel at the Raymer address as recently as on or about December 1, 2017, when a parcel addressed to "Matthew Durham" was delivered to the Raymer address. The source of that parcel, a vendor with an address in the Gangseo district of Seoul, South Korea, also shipped a parcel to the UPS mailbox, which was also delivered on or about December 1, 2017. Both parcels had been declared as beauty products——just like the Cheuk parcel, which contained fentanyl.

25. On or about October 25, 2017 and October 26, 2017, law enforcement conducted surveillance at the Raymer address. On or about October 25, 2017, law enforcement observed DURHAM walk from a black Audi A-6, which was parked outside the Raymer address, to a pedestrian door on the side of the building adjacent to the parking lot. DURHAM remained inside for several hours. Law enforcement later determined that the door DURHAM had entered was marked "15180 C," indicating that he had entered Unit C, the unit registered to him for utilities.

26. Law enforcement checked the license plate for the black Audi A-6 that had been operated by DURHAM and learned that it is registered to the name of DURHAM's father.

27. A gray Toyota Tundra pickup truck registered to DURHAM was recorded or surveilled by law enforcement outside the Raymer address on multiple dates between November 30, 2017 and December 12, 2017. The Toyota Tundra typically remained outside the Raymer address for several hours at a time between the hours of 11:00 a.m. and 5:00 p.m. Law enforcement had previously seen the Toyota Tundra parked outside DURHAM's residence on multiple dates in and around November 2017. Law enforcement has been monitoring the Raymer address using a pole camera installed outside the premises since on or about November 30, 2017. No one other than DURHAM has been observed going in and out of the Raymer address.

28. Given the lack of commercial activity detected at the Raymer address during surveillance; TABLACK's admitted lack of legitimate employment and further admissions to CS1 that he has purchased high-capacity pill press machines, that he presses bulk quantities of fentanyl pills, and that he has one worker; DURHAM's consistent presence at the Raymer address during the work week; DURHAM's registration for utilities at the

Raymer address; the heavy weight of several parcels delivered to the Raymer address; those parcels' source locations in China, a country from which law enforcement has confirmed TABLACK purchased both fentanyl and at least one pill press; the association between the addressee "Russuk LLC" on those parcels and TABLACK; and the delivery of parcels to DURHAM at the Raymer address, it is likely that TABLACK and DURHAM are working together, using pill press machines delivered to the Raymer address to run a pill mill at the Raymer address.

29. Based on the weight of parcels from China and Hong Kong addressed to the Raymer address versus the UPS mailbox, and the known contents of several of those parcels, law enforcement believes that smaller parcels containing fentanyl and small equipment or paraphernalia used for manufacturing pills, such as metal stamping dies, are sent to the UPS mailbox, associated with TABLACK, whereas larger shipments, such as those containing high capacity pill presses, are sent directly to the Raymer address, the pill mill operated by TABLACK and DURHAM.