NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ANDREW TABLACK. | Criminal No. 19-374 (MAS)<br><br>**MEMORANDUM OPINION** |

**SHIPP, District Judge**

This matter comes before the Court upon pro se Defendant Andrew Tablack's ("Defendant") Motion for Judgment of Acquittal. (ECF No. 148.) The United States of America (the "Government") relied on its prior submissions in opposing Defendant's Motion. (Trial Tr. 685:3-8.) The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1, which is applicable to criminal cases under Local Criminal Rule 1.1. For the reasons set forth herein, Defendant's Motion is denied.

I. **BACKGROUND**

A. **Charged Offenses**

In May 2019, a federal grand jury charged Defendant with manufacturing, distributing, and possessing a controlled substance analogue, specifically N-(1-phenethylpiperidin-4-yl)-N-phenylcyclopropanecarboxamide ("cyclopropyl fentanyl"), and with conspiracy to do the same from around March 2017 to December 20, 2017. (ECF No. 33.) As discussed below, the Controlled Substance Analogue Enforcement Act of 1986 (the "Analogue Act") treats "controlled substance analogues"—substances with chemical structures and pharmacological effects "substantially similar" to Schedule I or II controlled substances—as Schedule I controlled substances when "intended for human consumption." 21 U.S.C. §§ 802(32)(A), 813(a).

### B. Jury Trial

The Court held a six-day jury trial from July 7, 2021 through July 14, 2021. (*See* ECF Nos. 141, 144–47, 151.) The Government called as a witness Defendant's ex-girlfriend, Yuliya Brady. During Ms. Brady's testimony, the Government played a recorded conversation between Defendant and Ms. Brady in which Defendant discussed his "illegal" activities. (Trial Tr. 52:23-25.) Among other things, Defendant told Ms. Brady that he had ordered a powder from China to make oxycodone pills using "a simple, little science formula." (*Id.* at 58:8-20, 59:1-9.)

The Government also called as a witness Defendant's alleged co-conspirator, Damon Jobin. Mr. Jobin described his role in Defendant's drug operation, which was run from labs set up inside discrete California locations, including a warehouse. (*See id.* at 143:14-144:10, 227:16-228:21.) Mr. Jobin testified that Defendant showed him how to make "oxycontin," which were blue round pills that Defendant and Mr. Jobin also referred to as "oxy" and "blues." (*Id.* at 199:11-21, 200:5-7, 217:18-22.) To prepare the "mix," Defendant provided Mr. Jobin with a written "recipe" that contained measurements for three ingredients: (1) filler; (2) a substance that Defendant referred to as "diamond"; and (3) blue dye. (*Id.* at 218:1-11, 222:1-7, 248:1-12.) Regarding the "diamond," Defendant instructed Mr. Jobin to wear protective equipment, including a respirator and gloves, when handling the substance because, otherwise, the substance could kill him. (*Id.* at 218:10-16.) Once the mix was prepared, Mr. Jobin and Defendant used press machines to convert the mix into the blue pills. (*See id.* at 127:1-7, 210:7-211:7, 307:8-15.) Mr. Jobin then packaged those pills as instructed by Defendant: Mr. Jobin would place pills inside a vacuum-sealed bag; the vacuum-sealed bag would be placed inside a mylar bag; and the mylar bag would be placed in a shipping box. (*Id.* at 150:20-151:8.) As evidenced by text messages, Defendant instructed Mr. Jobin to prepare packages containing a specific number of pills—ranging in the tens of thousands—and then mail those packages to specific addresses in several states, including New

Jersey. (*See id.* at 177:17-179:6, 185:8-24, 251:8-253:10.)

In September 2017, the Drug Enforcement Administration intercepted three of Defendant's packages in New Jersey. (*See id.* at 388:11-23.) The Government presented the following testimony in that regard. DEA Special Agent Steven Miller testified that the intercepted packages contained mylar bags filled with "thousands of blue pills."[1] (*Id.* at 391:20-23, 392:24-25.) Regarding the mylar bags, Mr. Miller noted that "smugglers [use them] to confuse and confound x-ray machines." (*Id.* at 391:24-392:2.) DEA Senior Forensic Chemist Noel Vadell testified that he tested the blue pills and noted that they contained the same logo imprint found on legitimate oxycodone tablets: A 215. (*Id.* at 467:6-14.) Mr. Vadell's test results indicated that the blue pills contained cyclopropyl fentanyl, a fentanyl analogue. (*Id.* at 464:10-12.) Finally, the Government offered evidence that Defendant sold the blue pills on the "dark web"[2] where, in one posting, he advertised the blue pills as "Oxycodone 30 milligram pressed with real pure fentanyl 0.8 milligrams which is equal to 100 milligrams oxy as active substance." (*Id.* at 615:10-19.)

To address the similarities between cyclopropyl fentanyl and fentanyl, the Government called as witnesses DEA Drug Science Specialist Dr. Daniel Willenbring, and DEA Pharmacologist Dr. Teneille Walker. Dr. Willenbring testified that based on his analysis, the "chemical structure of cyclopropyl fentanyl is substantially similar to the chemical structure of fentanyl, a Schedule II controlled substance." (*Id.* at 372:13-20.) Dr. Walker, in turn, testified that based on her analysis, cyclopropyl fentanyl "has a depressant effect on the central nervous system

---

[1] After intercepting the packages, the DEA set up a controlled buy with Defendant using Bitcoin, which ultimately led to Defendant's arrest. (*See* Trial Tr. 418:9-22, 441:13-442:20.) Mr. Miller testified that the tracking numbers found on the packages matched the tracking numbers found in certain electronic devices later seized from Defendant. (*See id.* 408:6-24.)

[2] Mr. Miller testified that the dark web "is a place where illicit goods are bought and sold between people." (Trial Tr. 386:20-22.)

3

that is substantially similar to the depressant effects on the central nervous system of fentanyl." (*Id.* at 522:7-8.)

After the Government rested on July 13, 2021, Defendant moved for a judgment of acquittal. (*Id.* at 681:11–684:9.) The Court reserved its decision on the Motion. (*Id.* at 686:6-8.) Defendant then rested without presenting any evidence of his own. (*Id.* at 692:4.) The following day, the jury deliberated and returned a verdict of guilty on both counts.

## II.   LEGAL STANDARD

Rule 29(a)[3] provides that "[a]fter the government closes its evidence . . . , the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "[W]hen a court reserves decision on a motion for judgment of acquittal[,] 'it must decide the motion on the basis of the evidence at the time the ruling was reserved.'" *United States v. Taylor*, 559 F. App'x 122, 124 n.2 (3d Cir. 2014) (quoting Fed. R. Crim. P. 29(b)).

"[A] defendant who asserts that there was insufficient evidence to sustain a conviction shoulders 'a very heavy burden.'" *United States v. Tiangco*, 225 F. Supp. 3d 274, 278–79 (D.N.J. 2016) (quoting *United States v. Anderson*, 108 F.3d 478, 481 (3d Cir. 1997)). "In ruling on a motion for judgment of acquittal, the [d]istrict [c]ourt reviews the record 'in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt[] beyond a reasonable doubt based on the available evidence.'" *United States v. Ollie*, 624 F. App'x 807, 811 (3d Cir. 2015) (alteration in original) (quoting *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)). "A finding of insufficiency should be confined to cases where the prosecution's failure is clear." *Brodie*, 403 F.3d at 133 (citation omitted).

---

[3] All references to a "Rule" hereinafter refers to the Federal Rules of Criminal Procedure.

### III. DISCUSSION

#### A. The Indictment Is Sufficient

Although unclear, Defendant appears to seek dismissal of the indictment on the grounds that: (1) the indictment fails to charge an essential element of the offense; (2) the Analogue Act contains ambiguous terms; and (3) he "did not know the substance was controlled" during the relevant period. (*See* Def.'s Moving Br. 1–4, ECF No. 148.) In a prior opinion, the Court rejected some of these same arguments. *See United States v. Tablack*, No. 19-374, 2020 WL 5500382 (D.N.J. Sept. 11, 2020) (finding that the indictment was sufficient). Defendant did not formally move for reconsideration. Nonetheless, out of an abundance of caution given Defendant's pro se status, the Court will address Defendant's arguments.

"An indictment must contain 'a plain, concise and definite written statement of the essential facts constituting the offense charged.'" *United States v. Urban*, 404 F.3d 754, 771 (3d Cir. 2005) (quoting Fed. R. Crim. P. 7(c)(1)). An indictment is facially sufficient to warrant a trial on the merits if it "(1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution." *United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012). "[N]o greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy . . . ." *United States v. Rankin*, 870 F.2d 109, 112 (3d Cir. 1989).

1.     **Essential Elements**

Defendant does not argue that the factual allegations in the indictment are so sparse that he cannot prepare a defense or invoke double jeopardy. Instead, Defendant reraises an argument already considered and rejected by this Court: that "[t]he counts fail to charge the unlawful element by statutory definition in 21 U.S.C. 841(a)(1), 'a controlled substance.'" (Def.'s Moving Br. 2.) Once again, the indictment is sufficient because it tracks the language of the statutes which, in turn, contain the essential elements of the charged offenses. *Tablack*, 2020 WL 5500382, at *2; *see United States v. Olatunji*, 872 F.2d 1161, 1168 (3d Cir. 1989) ("It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words [] themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished'" (quoting *United States v. Hamling*, 418 U.S. 87, 117 (1974))).

2.     **Ambiguity**

Defendant also appears to argue that two elements in the Analogue Act are ambiguous. (*See* Def.'s Moving Br. 3–4.) Although Defendant does not directly identify the "two elements," Defendant appears to be referring to "controlled substance analogue" and "controlled substance" because those terms are bolded. (*See id.*) And although not bolded, Defendant may also be referring to the "knowledge" element. (*See id.*) In any event, Defendant's ambiguity argument is foreclosed by the very case he relies on in moving for acquittal. In *McFadden*, "the Supreme Court found the Analogue Act to be an 'unambiguous statute.'" *United States v. Way*, 804 F. App'x 504, 512 (9th Cir. 2020) (quoting *United States v. McFadden*, 576 U.S. 186, 187 (2015)). The Supreme Court also "reasoned that even if the Analogue Act were ambiguous, the statute's scienter requirement 'alleviate[s] vagueness concerns.'" *Id.* (alteration in original) (quoting *McFadden*, 576 U.S. at 187). Defendant's ambiguity argument therefore fails.

### 3. Knowledge

To the extent Defendant argues that the indictment should be dismissed because he "did not know the substance was controlled," that argument is misplaced. (Def.'s Moving Br. 3–4.) "An indictment returned by a legally constituted and unbiased grand jury, . . . if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956). Here, Defendant has not challenged the make-up of the grand jury nor alleged that any of its members were biased. And as discussed above, the indictment is legally sufficient. Thus, Defendant's "lack of knowledge" argument is more appropriately addressed below as part of his apparent argument that the Government failed to present sufficient evidence to sustain a conviction. *See United States v. DeLaurentis*, 230 F.3d 659, 661 (3d Cir. 2000) (Rule 12(b)(2) "authorizes dismissal of an indictment if its allegations do not suffice to charge an offense, but such dismissals may not be predicated upon the insufficiency of the evidence to prove the indictment's charges")).

### B. The Government's Evidence is Sufficient

Defendant's defense theory is essentially that he cannot be prosecuted for a controlled substance offense because (1) cyclopropyl fentanyl was only scheduled as a controlled substance after he was arrested for the alleged criminal conduct and thus (2) he could not have known that cyclopropyl fentanyl was a controlled substance during the period charged in the indictment. (*See* Def.'s Moving Br. 5–6.) This reasoning is flawed.

"The Analogue Act facilitates the regulation of new drugs which, though not currently outlawed, exhibit substantial similarities to a controlled substance found in either Schedule I or II." *United States v. Giggey*, 867 F.3d 236, 241 (1st Cir. 2017) (citations omitted). In other words, "the Analogue Act picks up where the [Controlled Substances Act of 1970 ('CSA')] leaves off, forbidding the possession and distribution of substances analogous to those listed in the CSA."

7

*United States v. Makkar*, 810 F.3d 1139, 1142 (10th Cir. 2015). Thus, it is of no moment that cyclopropyl fentanyl was not formally listed as a scheduled controlled substance until January 4, 2018, shortly after Defendant's arrest. *See* Schedules of Controlled Substances: Temporary Placement of Cyclopropyl Fentanyl in Schedule I, 83 Fed. Reg. 469–72 (Jan. 4, 2018); *see also Jones v. United States*, No. 19-4213, 2020 WL 7315912, at *2 (6th Cir. July 23, 2020) ("[T]here is no requirement that the analogue be listed on a schedule to fall within the purview of the CSA[.]"). To conclude otherwise would defeat the purpose of the Analogue Act—"to prohibit innovative drugs *that are not yet listed as controlled substances*." *United States v. Way*, No. 14-101, 2018 WL 2229272, at *7 (E.D. Cal. May 16, 2018) (noting that the statute sought to address "the time lag between the production of [] new designer drugs and their subsequent control under the Controlled Substances Act"). Defendant's argument on this issue therefore fails.

Defendant appears to overlook or ignore the fact that he was charged with offenses that involved a controlled substance analogue. As noted above, the Analogue Act defines a controlled substance analogue as a substance that has a chemical structure and pharmacological effect that is "substantially similar" to Schedule I or II controlled substances. 21 U.S.C. § 802(32)(A). If "intended for human consumption," a controlled substance analogue is "treated[] for the purposes of any Federal law as a controlled substance in [S]chedule I." *Id.* § 813(a).

At trial, the Government presented sufficient evidence to show that (1) cyclopropyl fentanyl qualifies as a controlled substance analogue and (2) Defendant intended that the substance be used for human consumption. With respect to the status of cyclopropyl fentanyl as a controlled substance analogue, Dr. Willenbring and Dr. Walker each testified that based on their respective analysis, cyclopropyl fentanyl has a chemical structure and a "depressant effect on the central nervous system" that is "substantially similar" to that of fentanyl, a Schedule I controlled substance. (Trial Tr. 372:13-20, 522:7-8.) As for the requirement that the substance be intended

for human consumption, the evidence showed that Defendant himself advertised on the dark web that the blue pills "can be used intravenously – oral – smoked – snorted." (*Id.* at 615:10-20). Based on the foregoing, the Government presented sufficient evidence to establish that cyclopropyl fentanyl qualifies as a controlled substance analogue and thus, under the Analogue Act, the substance may be treated as a Schedule I controlled substance. 21 U.S.C. § 813(a).

To the extent that Defendant argues the Government failed to present sufficient evidence to show that he acted knowingly, that argument also fails. Under *McFadden*, there are two ways that the Government can satisfy the knowledge requirement. *United States v. Requena*, 980 F.3d 30, 43 (2d Cir. 2020) (citing *McFadden*, 576 U.S. at 194). First, the Government "can present evidence that the defendant 'knew that the substance with which he was dealing is some controlled substance—that is, one actually listed on the federal drug schedules or treated as such by operation of the Analogue Act—regardless of whether he knew the particular identity of the substance.'" *Id.* (quoting *McFadden*, 576 U.S. at 194). Second, the Government "can present evidence that the defendant knew that the substance has a chemical structure and pharmacological effects substantially similar to[,] or greater than, those of a controlled substance in [S]chedule I or II." *Id.* (quoting *McFadden*, 576 U.S. at 193–95). In either case, the Government may offer direct or circumstantial evidence to prove that a defendant knew that the substance in question was treated as a scheduled controlled substance. *Id.* (quoting *McFadden*, 576 U.S. at 195 n.3). "Circumstantial evidence could include, for example, a defendant's concealment of his activities, evasive behavior with respect to law enforcement, knowledge that a particular substance produces a 'high' similar to that produced by a controlled substance, and knowledge that a particular substance is subject to seizure at customs." *Id.* at 44 (quoting *McFadden*, 576 U.S. at 192 n.1).

Here, the Government presented sufficient evidence from which a reasonable juror could conclude that, under the first alternative, Defendant knew the blue pills contained a substance that

9

was treated as a scheduled controlled substance. The jury heard the recorded conversation in which Defendant asserted that, unlike the Tylenol powder he purchased domestically because it is "not scheduled," he ordered a certain powder to make the blue pills from China. (Trial Tr. 57:10-22.) Defendant further asserted that the powder he ordered from China would be delivered to his mother's residence, who apparently "would want to go to jail." (*Id.* at 62:10-15.) During the same recorded conversation, Defendant noted that after learning he was under investigation, he reviewed over "50 affidavits from people who have been arrested." (*Id.* at 61:3-7.) As Defendant put it: "So [now] I know what not to do. I know what to avoid. I know what mistakes I used to make and I don't make [them] anymore. I know I'm very smart." (*Id.* at 61:3-24.)

The jury also heard testimony from Mr. Jobin, Defendant's alleged co-conspirator. Mr. Jobin testified that he and Defendant made the blue pills at labs set up inside discrete locations, including a shipping container and warehouse. (*See id.* at 143:14-144:10, 227:16-228:21.) Mr. Jobin also testified that Defendant instructed him to use protective equipment when handling the "diamond" substance used to make the pill because the substance was "very potent" and could "kill" Mr. Jobin. (*Id.* at 218:10-14.) Mr. Jobin further testified that when Defendant instructed him to prepare an order of the blue pills, Defendant would use a certain messaging app that would automatically delete Defendant's text message after a short amount of time. (*See id.* at 252:13-253:18.) That testimony was supported by screenshots recovered from Mr. Jobin's electronic device. (*See id.* at 255:1-5.) In addition, Mr. Jobin testified that Defendant instructed him to place the blue pills inside mylar bags when preparing the package for mailing which, according to Mr. Miller, "smugglers [do] to confuse and confound x-ray machines." (*See id.* at 150:20-151:8, 391:24-293:2.) As for the actual mailing, Mr. Jobin testified that Defendant instructed him to "make sure [he] was using different post offices." (*Id.* at 309:9-13.) The Government also offered evidence that Defendant sold the blue pills on the dark web where he

10

advertised the pills as, for example, "Oxycodone 30 milligram pressed with real pure fentanyl 0.8 milligrams which is equal to 100 milligrams oxy as active substance." (*Id.* at 615:10-19.)

Based on the foregoing, the Court finds that a reasonable juror could have found that Defendant knew the blue pills contained a substance that was treated as a scheduled controlled substance.

In addition, the Court finds that the Government presented sufficient evidence to satisfy the knowledge requirement under the second alternative. Mr. Jobin's testimony regarding the "recipe" that he was given by Defendant suggests that Defendant knew the blue pills had a chemical structure that is substantially similar to a scheduled controlled substance. As Mr. Jobin testified, Defendant provided the ingredients and measurements necessary to make the blue pills. (*Id.* at 218:1-11, 222:1-7, 248:1-12.) Mr. Vadell's testimony that the blue pills contained the same logo imprint found on legitimate oxycodone tablets—A 215—also suggests that Defendant had knowledge regarding the chemical structure. (*Id.* at 467:6-14.) As to pharmacological effects, the posting that Defendant placed on the dark web supports a finding that Defendant knew the blue pills had pharmacological effects that are substantially similar to a scheduled controlled substance. In that posting, Defendant represented that the pills were "pressed with real pure fentanyl 0.8 milligrams which is equal to 100 milligrams oxy as active substance" and indicated that the pills could "be used intravenously – oral – smoked – snorted." (*Id.* at 615:10-20.) On these facts, the Court finds that the Government presented sufficient evidence from which a reasonable juror could conclude that Defendant knew the blue pills had chemical structures and pharmacological effects that are substantially similar to a scheduled controlled substance.

In sum, the Court finds that Defendant failed to meet his heavy burden of showing that the Government presented insufficient evidence to sustain a conviction and, accordingly, denies Defendant's Motion for Judgment of Acquittal.

IV. <u>**CONCLUSION**</u>

For the foregoing reasons, Defendant's Motion for Judgment of Acquittal is denied. The Court will enter an Order consistent with this Memorandum Opinion.

/s/ MShipp

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE